```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                         :    20 MDL NO. 2946
IN RE: INCLUSIVE ACCESS COURSE           :        (DLC)
MATERIALS ANTITRUST LITIGATION           :
                                         :    OPINION & ORDER
--------------------------------------- :
                                         :
This Opinion and Order applies to the    :
following actions:                       :
                                         :
20cv3162 20cv3660 20cv6314 20cv6317      :
20cv6331 20cv6333 20cv6334 20cv6335      :
20cv6364 20cv6840 20cv6842 20cv6845      :
20cv6847 20cv6848.                       :
                                         :
--------------------------------------- X
```

APPEARANCES:

For the plaintiffs:

Natasha J. Fernandez-Silber
John Radice
April Lambert
Daniel Rubenstein
Rishi Raithatha
Radice Law Firm, PC
475 Wall Street
Princeton, NJ 08540

Lauren G. Barnes
Thomas M. Sobol
Abbye Klamann Ognibene
Hannah Schwarzchild
Rochella T. Davis
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

For defendant McGraw Hill LLC:

William F. Cavanaugh, Jr.
Saul B. Shapiro
Amy N. Vegari
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036


For defendant Pearson Education, Inc.:

Jennifer Quinn-Barabanov
Zachary B. Schreiber
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Michael Dockterman
Steptoe & Johnson LLP
227 West Monroe St. Suite 4700
Chicago, IL 60606

For defendant Cengage Learning, Inc.:

Eric Mahr
Andrew J. Ewalt
Richard Snyder
Lauren Kaplin
Freshfields Bruckhaus Deringer US LLP
700 13th Street NW, 10th Floor
Washington DC, DC 20005

For defendants Barnes & Noble College Booksellers, LLC and
Barnes & Noble Education, Inc.:

Rachel S. Brass
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

Adam J. Di Vincenzo
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

For defendant Follett Higher Education Group, Inc.:

Craig C. Martin
Matt D. Basil
Willkie Farr & Gallagher LLP
300 N. LaSalle Street
Chicago, IL 60654

DENISE COTE, District Judge:

The plaintiffs, who are college and graduate school students, bring antitrust claims against three publishers of textbooks and two on-campus bookstore operators.  The plaintiffs assert that the defendants have conspired to eliminate competition presented by the robust market for used textbooks.  The defendants are alleged to have convinced universities and their faculty to require students to purchase their textbooks and associated course materials in a digital format through a program referred to as Inclusive Access.  This is alleged to have restricted consumer choice in the market for textbooks and to have raised textbook prices for students.  The defendants have moved for dismissal of the entire complaint.  For the reasons stated below, the defendants' motion is granted.

## Background

The following facts are taken from the Second Consolidated Amended Class Action Complaint ("SAC") and documents integral to it, unless otherwise noted, and are taken to be true for purposes of this motion.  <u>Coal. for Competitive Elec. v.</u>

<u>Zibelman</u>, 906 F.3d 41, 48-49 (2d Cir. 2018).  The plaintiffs
bring this action as representatives of a class defined as "All
students at colleges or graduate schools in the United States
who purchased subscriptions to Inclusive Access Materials."[1]  The
SAC defines "Inclusive Access Materials" as "textbooks and
Ancillary Required Course Materials assigned through the
Inclusive Access system."  It defines "Ancillary Required Course
Materials" as "required assignments, homework problems, exams,
and quizzes."  "University" is defined as "any institution of
undergraduate or graduate higher education, including any
college of higher education."  This Opinion will use the term
Institutions to refer to colleges and universities, except when
quoting directly from the SAC.

Three of the four named plaintiffs purchased subscriptions
to Inclusive Access from the Retailer Defendants.  The SAC
asserts, however, that a fourth plaintiff, Kira Cloonan
("Cloonan"), "was required to and did purchase subscriptions to
Inclusive Access Materials from [Publisher] Defendant Pearson."

---

[1] Alternatively, in the event they are determined not to be
direct purchasers, the plaintiffs explain that they bring this
action on behalf of "all persons and entities who indirectly
purchased Inclusive Access Materials from the Defendants or co-
conspirators for personal use."

A.   Secondary Market for Textbooks

The three Publisher Defendants -- Cengage Learning, Inc. ("Cengage"); McGraw Hill, LLC ("McGraw Hill"); and Pearson Education, Inc. ("Pearson") -- are the dominant publishers of college textbooks in the United States.  Together, they control 80-90% of the market for new textbooks.

In the early 2000s, the Publisher Defendants began to face increasing competition from the rapidly growing secondary marketplace for textbooks.  At online sites such as Amazon, eBay, and Chegg, and at brick-and-mortar vendors, college students could buy, sell, and rent used textbooks at prices dramatically below the prices for new textbooks.

On-campus bookstores also suffered from the rapid growth of the secondary market for textbooks.  Although on-campus bookstores sold both new and used textbooks, they faced competition in the market for used textbooks from off-campus and online bookstores.  The majority of on-campus bookstores are operated by the Retailer Defendants: Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc. (collectively, "Barnes & Noble") and Follett Higher Education Group, Inc. ("Follett").  Together, they manage on-campus bookstores at over 700 Institutions.

B.    Inclusive Access

1.    Origins

In response to the rise of the secondary market for college textbooks, the Publisher Defendants adopted a "digital-first strategy" that aimed to curtail the growth of the secondary market by reducing sales of new hardcopy textbooks.  As part of that strategy, the Publisher Defendants developed "Inclusive Access,"

> a system of providing time-limited access to digital
> course content[2] that requires University students to
> obtain their textbooks only in an online format and
> only from their official on-campus bookstore (or from
> publishers themselves) and not from any other source.[3]

The Publisher Defendants first experimented with products similar to Inclusive Access in 2014 and 2015 through "pilot programs," but the products failed to take root.  The plaintiffs claim that:

> Inclusive Access was rolled back at a number of
> institutions after a study showed that, in a majority

---

[2] The SAC notes that digital textbooks, whether offered through Inclusive Access or otherwise, are sometimes accompanied by Ancillary Required Course Materials.

[3] The plaintiffs vacillate between using the term Inclusive Access to refer to digital textbooks and course materials sold by the Publisher Defendants to the Institutions and using it to describe the process and contractual arrangements for the delivery of these materials.  The Defendants contend that the plaintiffs "mischaracterize[] . . .  Inclusive Access as if it were the educational materials themselves, rather than one of several mechanisms for the distribution and sale of those materials."

of classes where an Inclusive Access pilot program was launched [in 2014 or 2015], the percentage of students with a grade of "C" or better declined.

On May 18, 2015, the United States Department of Education ("DOE") published for comment a proposed rule pursuant to Title VII of the Higher Education Act of 1965 that would permit, among other things, Institutions to include the cost of textbooks as part of tuition and fees ("Notice").  80 Fed. Reg. 28484 (2015). In the Notice, the DOE stated that it "initially considered prohibiting institutions from including books and supplies as part of tuition and fees," but had

> decided against a total prohibition on including books and supplies as part of tuition and fees, and agreed to a compromise position that would still benefit students, allow institutional flexibility when materials are integral to the course, and hold institutions accountable through cost transparency.

Id. at 28521-22.

On October 30, 2015, the DOE published the final rule, which became effective on July 1, 2016 ("Rule 164").  Id. at 67126.  Rule 164 allows Institutions to directly bill students for textbooks and supplies on their tuition statements in some circumstances.  It provides:

> An institution may include the costs of books and supplies as part of tuition and fees under paragraph (c)(1)(i) of this section if -
>
>> (i) The institution -

7

(A) <u>Has an arrangement with a book publisher or other entity</u> that enables it to make those books or supplies available to students <u>below competitive market rates</u>;

(B) Provides a way for a student to obtain those books and supplies by the seventh day of a payment period; and

(C) Has a policy under which <u>the student may opt out</u> of the way the institution provides for the student to obtain books and supplies under this paragraph (c)(2). . . .

(ii) The institution documents . . . that the <u>books or supplies</u>, <u>including digital or electronic course materials, are not available elsewhere</u> or accessible by students enrolled in that program from sources other than those provided or authorized by the institution[] . . . .

34 C.F.R. § 668.164(c)(2) (2016) (emphasis supplied).

The DOE explained that it was motivated by its statutory mandate to protect "the rights of students as consumers." 80 Fed. Reg. 67138 (2015). Commentators had persuaded it "that including books and supplies [in tuition] would not only enable an institution to negotiate better prices for its students, it would result in students having acquired course materials at the beginning of a term or payment period." <u>Id.</u> Aware, however, that the inclusion of the cost of books as part of tuition would mean that "students will not have the option of seeking even lower cost alternatives such as used books, rentals, or e-

books," the Rule requires the Institution to provide the student
an opt-out.  Id. at 67139.

The DOE also justified its adoption of the Rule by
reference to the increased demand for digital course material:

> We are convinced that digital platforms, and digital
> course content in general, will become more ubiquitous
> and that including digital content as part of tuition
> and fees ensures that students have access to this
> technology.

Id. at 67126-01.[4]  The DOE cited "the best financial interests of
students" as its guiding principle in drafting the Rule.  Id. at
67138.

### 2.    Adoption of Inclusive Access

The SAC alleges that the Defendants "began working together
in 2015 and 2016 to promote" Inclusive Access.  McGraw Hill
launched a "precursor" to Inclusive Access "in 2015," Cengage's
"earliest known contracts with Universities for Inclusive Access
programs date back to early 2016," and Pearson "launched its
Inclusive Access program in 2016."  They began to "evangelize"
Inclusive Access, and Inclusive Access programs were introduced

---

[4] The SAC does not highlight the enactment of Rule 164 in its
description of the adoption of Inclusive Access, but it does
mention that the Rule "govern[s] automatic billing for
textbooks."  The SAC also asserts that the Defendants have
violated Rule 164 because textbooks distributed through
Inclusive Access are not offered at a lower-than-competitive
market rate and students are provided only an "illusory" opt-
out.

at Institutions across the United States.  For example, between July 2016 and November 2017, Pearson executed agreements to implement Inclusive Access with over 200 Institutions.  The SAC alleges that by promoting Inclusive Access, "the Defendants are effectively 'aging out' traditional textbooks."

### 3.  Features

Digital textbooks delivered through Inclusive Access programs are typically cheaper than new hardcopy textbooks.  On the other hand, they are more expensive than used hardcopy textbooks sold or rented on the secondary market.

Students are "automatically" subscribed to Inclusive Access when they enroll in a college course that has adopted it and are automatically charged for the digital textbooks on their tuition bills.  Students may elect to purchase "print upgrades" for an additional fee, but the Publisher Defendants limit the number of students who may do so in any given course.  Although students nominally have the right to opt out of Inclusive Access, they are often warned that opting out of Inclusive Access will make passing the course "impossible" since they will not have access to Inclusive Access if they opt out.

### C.  Agreements

The plaintiffs allege that the Defendants entered into agreements that "induce[] Universities to mandate Inclusive

Access" and "create[] exclusive dealing relationships between the Publisher Defendants and on-campus bookstores, including those run by the Retailer Defendants."  They further allege that "[e]ach of these contracts has the purpose and effect of destroying the Defendants' major source of competition (the secondary marketplace for textbooks)."  The SAC describes agreements between Institutions and their on-campus bookstores, which are referred to as Bookstore Operating Agreements, and between Institutions and Publisher Defendants, which are referred to as Institution Agreements.

      1.   Bookstore Operating Agreements

Through Bookstore Operating Agreements, the Institutions engage the Retailer Defendants to operate and provide services for their on-campus bookstores.  Under a Barnes & Noble Bookstore Operating Agreement ("B&N Agreement"),[5] for example, Barnes & Noble "shall fill orders for books and required supply items from term to term in accordance with textbook and supply adoptions by the faculty," and shall contact "all faculty members for their textbook and supply adoptions."  The

---

[5] A B&N Agreement between Barnes & Noble and Eastern Kentucky University, dated June 30, 2017, was described in the SAC.  The Defendants provided that agreement as an exhibit to their motion to dismiss.

Institution is "not . . . responsible for compiling, nor shall it maintain, a list of such adoptions."

The B&N Agreement made Barnes & Noble the exclusive buyer and seller of the Institution's textbooks, including digitally published or distributed course materials.  To underscore the exclusive nature of the relationship between Barnes & Noble and the Institution, the Agreement states:

> [The Institution] shall not contract with any third party to provide any services of the type outlined in this Agreement whether on or off campus, through e-commerce sites, hyperlinks to alternate sources, or otherwise endorsed or supported by [the Institution].

The B&N Agreement gives the Institution commissions on the gross sales of any hardcopy and digital textbooks.  The SAC explains that "in some instances" the Retailer Defendants also pay the Institutions up-front signing bonuses of $1 million or more when the Institution signs an on-campus bookstore contract.

2.    Institution Agreements

The SAC also describes an Institution Agreement between each of the Publisher Defendants and an Institution that participates in Inclusive Access.  The Defendants have provided the full agreements with their motion to dismiss.

     i. Pearson Agreement

 Under a Pearson Institution Agreement ("Pearson Agreement"),[6] for example, the Institution selects, and Pearson approves, a third-party (in this case, Follett) to operate the Institution's on-campus bookstores and "purchase, on its behalf," for two years, digital textbooks and Ancillary Required Course Materials from Pearson.  If the Institution does not enroll a minimum number of its students in Inclusive Access, the Publisher Defendant can terminate the agreement or raise the prices of Inclusive Access textbooks.[7]  An exhibit attached to the Pearson Agreement provides an initial list of courses that will adopt Inclusive Access textbooks.

 The Pearson Agreement also contemplates discounts for Inclusive Access textbooks.  For instance, Pearson will sell its digital textbooks[8] at a discount to the online purchase price for the corresponding "nationally available eBook."  The Institution

---

[6] The agreement is between Pearson and the University of Florida Board of Trustees, dated May 1, 2017.

[7] The Pearson Agreement provides that the Institution must achieve thousands of enrollments in the first year and multiples of that number in the second year.  An enrollment is defined as "one student registered in one Course."

[8] The SAC does not separately define digital textbooks and eBooks.  This Opinion therefore only uses the term digital textbooks except when quoting from the SAC or the agreements upon which it relies.

and its on-campus bookstore may not sell the digital textbooks
to students at a price more than a defined margin above the
agreement's discounted price.  Pearson also agrees to provide
the Institution or its on-campus bookstore "the option" to
purchase, at a set price, a loose-leaf print upgrade version of
the digital textbooks.

### ii.  Cengage Agreement

Under a Cengage Institution Agreement ("Cengage
Agreement"),[9] Cengage agrees to offer the Institution digital
textbooks for a two-year period at a discount and to give the
Institution's on-campus bookstore the right to acquire access to
those textbooks on the Institution's behalf.  The discount is
off of Cengage's "then current digital list price."  Cengage
agrees to provide loose-leaf versions of the digital textbooks
that have been purchased under the agreement for a substantial
minority of the enrollments at a defined price per book.

### iii. McGraw Hill Agreement

Under a McGraw Hill Institution Agreement ("McGraw Hill
Agreement"), the Institution's "Auxiliary," which is described
as the Subscriber, agrees to adopt digital McGraw Hill textbooks
as the required course materials for courses described in an

---

[9] The Cengage Agreement, dated March 21, 2017, is between Cengage
and Central Washington University.

attachment to the agreement.[10]  The McGraw Hill Agreement
provides that the Subscriber "shall purchase and [McGraw Hill]
shall provide access for each of the Registered Students in each
Course" at the discounted fees listed in the attachment.  The
Agreement also allows the Subscriber to order a loose-leaf print
version of the digital textbook for each student for an
additional per-semester fee.[11]

    D.    Electronic Publishers Enforcement Group

In 2016, the Publisher Defendants and two other publishing
companies formed a trade association, Electronic Publishers
Enforcement Group ("EPEG").  EPEG maintains a website and
promulgates anti-counterfeiting "best practices" guidelines for
the purpose of eliminating counterfeit textbooks.

---

[10] The McGraw Hill Agreement, dated March 27, 2019, is between
McGraw Hill and Aztec Shops, Ltd., "an Auxiliary" of San Diego
State University.

[11] None of the Bookstore Operating Agreements or Institution
Agreements use the term "Inclusive Access."  The McGraw Hill
Agreement, for example, refers to a "web-based solution" that
enables students to subscribe to "MHE Content," consisting of
"certain online products and services . . . offered by MHE
through [its] website . . . ."  The Pearson Agreement refers to
"Pearson Products," including "eBooks," "Revel," "MyLabs," and
"Mastering."  The Cengage Agreement describes "Titles" that
comprise "eBooks and digital homework solutions."  The B&N
Agreement covers, among other things, digital textbooks and
"course materials and supplies, including . . . materials
published or distributed electronically and/or through learning
management systems, or sold over the Internet."

E.   Procedural History

On January 22, 2020, off-campus college textbook retailers and online booksellers filed a class action in the District of Delaware asserting antitrust claims against the Defendants over their use of Inclusive Access ("Retailer Plaintiffs Action"). Student plaintiffs filed over a dozen similar actions thereafter.

On August 11, the Judicial Panel on Multidistrict Litigation ordered the centralization of Inclusive Access-related cases in this Court.  Of the fourteen cases that have been transferred, thirteen are class actions brought by student purchasers of Inclusive Access.[12]  Lead counsel for both sets of actions were chosen at a September 3 conference.

The student plaintiffs filed a consolidated amended complaint on October 16.  On December 18, the student plaintiffs filed the SAC instead of opposing a December 4 motion to dismiss filed by the Defendants.  The Defendants' motion to dismiss the SAC was filed on January 22, 2021, and became fully submitted on March 9.  Meanwhile, the defendants in the Retailer Plaintiffs Action moved to dismiss that action as well.  That motion is addressed in a separate Opinion filed today.

---

[12] An additional student purchaser class action that is before this Court, Cabral v. Cengage Learning, Inc., et al., 20cv3660, is related to this multi-district litigation.

16

The SAC alleges that the Defendants entered into a conspiracy to restrain trade in several textbook markets through the implementation of Inclusive Access.  The plaintiffs claim that the conspiracy is an unreasonable restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.  The SAC also alleges that each Defendant monopolized each of the textbook markets it describes, and has conspired to do so, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.  In addition, the plaintiffs bring a variety of state law claims. The plaintiffs seek damages and injunctive relief under the Clayton Act.  15 U.S.C. §§ 15, 26.

## Discussion

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor."  Zibelman, 906 F.3d at 48-49.  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A complaint must do more than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation."  Id. (quoting

17

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In determining the adequacy of a complaint, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

This Opinion will first address the plaintiffs' claims under the Sherman Act.  It will then turn to their claims under the state antitrust statutes.

I.   Sherman Act Claims

To survive a motion to dismiss, a Sherman Act claim must allege an antitrust injury, define a relevant market, and plausibly allege conduct in violation of the antitrust laws. Concord Assocs., L.P. v. Ent. Properties Tr., 817 F.3d 46, 52 (2d Cir. 2016).  This section will first determine whether each of the four representative plaintiffs has antitrust standing. It will then evaluate the plaintiffs' claims brought under § 1 of the Sherman Act.  Finally, it will examine the plaintiffs' claims brought under § 2.

A.   Antitrust Standing

The Defendants contend that, as indirect purchasers of Inclusive Access, the plaintiffs lack standing to sue the Defendants for damages.  See Illinois Brick Co. v. Illinois, 431

18

U.S. 720 (1977).  Section 4 of the Clayton Act entitles "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to treble damages.  15 U.S.C. § 15.  Applying § 4, the Supreme Court has "consistently stated that the immediate buyers from the alleged antitrust violators may maintain a suit against the antitrust violators," but "indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue." Apple Inc. v. Pepper, 139 S. Ct. 1514, 1520 (2019) (citation omitted).  This "indirect purchaser rule" stems from the Supreme Court's decision in Illinois Brick, which "established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers."  Id. (citation omitted).  "The Illinois Brick Court listed three reasons for barring indirect-purchaser suits: (1) facilitating more effective enforcement of antitrust laws; (2) avoiding complicated damages calculations; and (3) eliminating duplicative damages against antitrust defendants."  Id. at 1524.

      1.   Retailer Defendants

The SAC adequately pleads standing to sue the Retailer Defendants for damages.  The SAC alleges that three of the named plaintiffs purchased their Inclusive Access subscriptions from on-campus bookstores operated by one or the other of the two

19

Retailer Defendants.  Throughout the SAC, the plaintiffs allege
that on-campus bookstores are the exclusive sellers of Inclusive
Access.  The SAC alleges that the Bookstore Operating Agreements
are agreements "between a University and a Retailer Defendant
vesting the retailer with exclusive rights to distribute
Inclusive Access Materials on the University's campus."  This
allegation is borne out by the Bookstore Operating Agreements
themselves, which provide that an on-campus Retailer Defendant
shall be the Institution's "exclusive" seller of any Inclusive
Access textbooks that the Institution's students require for
their courses.

The Defendants do not deny that the SAC plausibly alleges
that students purchase Inclusive Access from the Retailer
Defendants.  They instead emphasize that it is the Institutions
that purchase Inclusive Access from the Publisher Defendants.
These arrangements between the Publisher Defendants and the
Institutions do not affect, however, the plaintiffs' standing to
sue the Retailer Defendants.

2.   Publisher Defendants

While three of the four plaintiffs are alleged to have
purchased Inclusive Access from the Retailer Defendants, one of
the plaintiffs is alleged to have purchased Inclusive Access
from one of the Publisher Defendants.  In a single paragraph,

20

the SAC asserts that Cloonan "was required to and did purchase
subscriptions to Inclusive Access Materials from Defendant
Pearson."  The Defendants argue that the SAC

> fail[s] to explain how . . . Cloonan's alleged direct
> purchase from Pearson, made through Pearson's website
> or by other means, qualifies as Inclusive Access,
> whose signature characteristics, according to the
> [SAC], include automatic subscription and direct
> billing by the university.

The SAC's conclusory assertion regarding Cloonan's purchase
does not plausibly plead that she directly purchased an
Inclusive Access textbook from Pearson.  The SAC consistently
alleges that Inclusive Access is sold by the Publisher
Defendants to the Institutions and sold to the students by those
Institutions' on-campus bookstores.  The SAC defines Inclusive
Access as "a partnership between an institution, bookstore, and
publisher to deliver digital course materials to students."
Nowhere does the SAC allege that the Publisher Defendants
operate separate distribution channels for Inclusive Access in
which they directly sell the product to students.  Accordingly,
with its meager allegation regarding Cloonan's purchase, the SAC
fails to plausibly plead that Cloonan directly purchased an
Inclusive Access subscription from Pearson.

In opposing the Defendants' motion, the plaintiffs argue
that the factual circumstances of Cloonan's alleged purchase
from Pearson are ill-suited to resolution on a motion to

dismiss.  But the Supreme Court's decisions in <u>Iqbal</u> and <u>Twombly</u> require "factual amplification where needed to render a claim plausible . . . ."  <u>Arista Recs., LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010) (citation omitted).  The plaintiffs have provided no such amplification.  Their pleading of Cloonan's direct purchase is instead a threadbare attempt to circumvent the requirement that each plaintiff plead antitrust standing. This the plaintiffs may not do.

The plaintiffs have standing to sue the Retailer Defendants, but they are barred from suing the Publisher Defendants by the indirect purchaser rule of <u>Illinois Brick</u>. Accordingly, the plaintiffs' damages claims against the Publisher Defendants, counts 4, 5, and 6, are dismissed.[13]

---

[13] The plaintiffs in this case seek both damages and injunctive relief.  The Supreme Court stated in <u>Apple Inc. v. Pepper</u>:

> <u>Illinois Brick</u> held that the direct-purchaser requirement applies to claims for damages.  <u>Illinois Brick</u> did not address injunctive relief, and we likewise do not address injunctive relief in this case.

139 S. Ct. 1514, 1520 n.1 (2019); <u>see also</u> <u>id.</u> at 1527 & n.1 (Gorsuch, J., dissenting) (arguing that under "traditional proximate cause principles," <u>Illinois Brick</u> should be read to bar suits by indirect purchasers for injunctive relief).

B.   Section 1

Defendants move to dismiss the plaintiffs' claims under §
1, counts 1, 2, 4, and 5,[14] on the ground that the SAC fails to
plead an agreement with respect to any of these alleged
conspiracies.  Section 1 of the Sherman Act prohibits contracts,
combinations, or conspiracies in restraint of trade.  US
Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 54 (2d Cir.
2019).  "Although the Sherman Act, by its terms, prohibits every
agreement 'in restraint of trade,' the Supreme Court has long
recognized that Congress intended to outlaw only unreasonable
restraints."  United States v. Apple, Inc., 791 F.3d 290, 320
(2d Cir. 2015) (citation omitted).  "Thus, to succeed on an
antitrust claim, a plaintiff must prove that the common scheme
designed by the conspirators constituted an unreasonable
restraint of trade either per se or under the rule of reason."
Id. at 320-21.  Section 1 embraces both horizontal and hub-and-
spoke conspiracies.  Id. at 313-14; Anderson News, L.L.C. v. Am.
Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012).

"The first crucial question in a Section 1 case is
therefore whether the challenged conduct stems from independent

---

[14] Counts 1 and 2 are for injunctive relief; counts 4 and 5 are
for damages.  Each of these counts also alleges a conspiracy-to-
monopolize claim in violation of § 2.  That claim is addressed
as part of the § 2 discussion below.

decision or from an agreement, tacit or express." Apple, 791 F.3d at 314-15 (citation omitted).  At the pleading stage, a plaintiff must allege sufficient facts to support the inference that a conspiracy existed.  Mayor and City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013).  An allegation of parallel conduct, standing alone, is not sufficient to plead the existence of a conspiracy.  Apple, 791 F.3d at 315.  "[S]uch behavior could be the result of coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  Id. (citation omitted).

Antitrust conspiracies are "rarely evidenced by explicit agreements and nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  Gelboim v. Bank of Am. Corp., 823 F.3d 759, 781 (2d Cir. 2016) (citation omitted).  Therefore, the existence of "additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts" can serve to permit an inference that a conspiracy exists.  Apple, 791 F.3d at 315 (citation omitted).  A non-exhaustive list of plus factors includes: "(1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged

conspirators; and (3) evidence of a high level of interfirm communications." Gelboim, 823 F.3d at 781 (citation omitted).

The SAC principally alleges a horizontal conspiracy among the Publisher Defendants "to eliminate competition from the secondary marketplace and raise the prices students pay for textbooks." The SAC appears to allege two other forms of conspiracies, although it does not state them with particularity. These are: (1) a horizontal conspiracy between the Retailer Defendants, and (2) hub-and-spoke conspiracies, with each Publisher as the "hub" and the Retailer Defendants and/or Institutions as the "spokes." In opposing the Defendants' motion, however, the plaintiffs almost exclusively defend their claim that the Publisher Defendants entered into a horizontal conspiracy. The plaintiffs argue that the "Inclusive Access conspiracy is a fundamentally horizontal conspiracy" "driven by the Publishers." Under any of its proposed conspiracies, however, the SAC fails to plausibly allege that the Defendants entered into an agreement.

1. Horizontal Conspiracy: Publisher Defendants

The SAC fails to plausibly allege that the three Publisher Defendants agreed with each other to restrain trade. The SAC does not describe any direct evidence of such an agreement. Nor does it plead facts that circumstantially suggest a meeting of

25

the minds to restrain trade as alleged here.  Instead, the SAC
describes market conditions that would have independently
suggested to any publisher of textbooks that digital innovations
such as Inclusive Access might help their bottom line.  As
detailed in the SAC, there was a flourishing secondary
marketplace for textbooks and the sales of new textbooks had
declined.  These phenomena had a negative impact on publishers'
revenue and profits.  Then, in 2016, the DOE adopted a rule that
permitted Institutions to include the cost of books and
supplies, including digital textbooks, in tuition bills.
Meanwhile, the digital revolution was well underway and both
faculty and students were accustomed to using electronic devices
to access information.  These phenomena affected every textbook
publisher and gave each of them an incentive to develop digital
textbooks that could be charged on a tuition bill.

     Underscoring this commonsense reaction to market phenomena,
the SAC pleads that the adoption of the Inclusive Access program
for courses was significantly more profitable for a publisher
than the sale of hardcopy textbooks.  Digital materials are less
expensive to produce and reduce the opportunity for competition
in the secondary market.  Taken together, these allegations
suggest that the Publisher Defendants' decisions to implement
Inclusive Access were likely the result of "independent

responses to common stimuli." Apple, 791 F.3d at 315. They do not support an inference that Inclusive Access was adopted and promoted because there was a conspiracy among the Publisher Defendants.

The plaintiffs argue that they have plausibly alleged a horizontal conspiracy among the three Publisher Defendants by pointing principally to three "plus" factors. Taken singly or together, these allegations in the SAC do not plausibly plead a conspiratorial agreement.

First, the plaintiffs argue that the Publisher Defendants had a common motive to conspire to protect their historical prices and market shares. This argument confuses two phenomena. While the SAC describes a commercial environment that would motivate any textbook publisher to independently consider the advantages of adopting a digital textbook regime like Inclusive Access, it does not describe an environment that encouraged or required them to conspire with each other to do so. After all, a motive to innovate is different than a motive to conspire. At best, the SAC describes conscious parallelism, and that is insufficient to plead that the Publisher Defendants conspired with each other. Connecticut Fine Wine & Spirits, LLC v. Seagull, 932 F.3d 22, 38 (2d Cir. 2019); Twombly, 550 U.S. at 553-54.

As a second plus factor, the plaintiffs claim that each Publisher Defendant acted against its own economic self-interest when it introduced Inclusive Access.  The SAC alleges that

> [i]f an individual Publisher Defendant moved on its own to introduce a digital-only subscription model like Inclusive Access, it would have been perceived as offering an experimental, overly restrictive, and higher priced product and would have lost sales to competitors willing to sell textbooks in a variety of formats, including e-books and print, which students prefer.

Based on this analysis, the plaintiffs contend that no single publisher could "shift the marketplace away from print" textbooks.  In support of this claim, the SAC points to the independent efforts by the Publisher Defendants to promote programs like Inclusive Access before 2016 and alleges that it was only in 2016 that the Publisher Defendants implemented a "hard switch" by "rolling out their Inclusive Access programs together."

There are at least three problems with this argument. First, it ignores the impact of the DOE's adoption of Rule 164 in 2016.  With that adoption, Inclusive Access became a government-sanctioned billing option for Institutions, allowing the costs of Inclusive Access to be added to tuition bills.

Second, the plaintiffs' argument implies that the Publisher Defendants colluded to remove hardcopy textbooks from the marketplace and thereby coerce Institutions into accepting

digital textbooks through Inclusive Access.[15]  But the SAC stops
short of actually asserting that the Publisher Defendants
discontinued their hardcopy offerings.  Moreover, any such
allegation would be in tension with the very Institution
Agreements on which the SAC relies.  Those contracts include
references to the comparable hardcopy textbook.

Finally, according to the SAC, Institutions adopted
Inclusive Access in order to increase the revenues at their on-
campus bookstores, which pay them commissions.  Based on the
SAC's allegations, it was in each Institution's economic self-
interest to adopt Inclusive Access for its students and faculty.
These overlapping incentives did not require any collusion among
the Publisher Defendants.

---

[15] The plaintiffs briefly contend that the Publisher Defendants
also coerced students into purchasing Inclusive Access materials
and that this coercion constitutes another plus factor.  It is
the Institution, presumably in consultation with faculty, that
decides whether to purchase Inclusive Access for any particular
course.  The extent to which students are deprived of a voice in
that decision is irrelevant to the question of whether the SAC
contains a plausible claim that the Publisher Defendants
colluded with each other.

Moreover, the plaintiffs misread the precedent on which they
rely, Ambook Enterprises v. Time Inc., 612 F.2d 604, 616 (2d
Cir. 1979), in arguing that consumer coercion is a plus factor
for purposes of § 1.  The "coercion" that the Ambook court
identified as a possible plus factor was "[c]oerced
parallelism," i.e., coerced participation in a conspiracy,
rather than consumer coercion.  Id. & n.19.

As a third plus factor, the SAC alleges that there was a high level of interfirm communication among the Publisher Defendants.  It points to the high degree of concentration in the textbook publishing industry and alleges that the Publisher Defendants' trade association EPEG served as a convenient forum for their conspiratorial planning.  This description of opportunities to conspire to restrict competition does not raise the inference that the Publisher Defendants actually engaged in any unlawful activity.  Having failed to plausibly plead an agreement, the SAC fails to allege a horizontal conspiracy among the Publisher Defendants.

### 2.   Horizontal Conspiracy: Retailer Defendants

The SAC also appears to allege that the two Retailer Defendants conspired with each other to restrain trade in violation of § 1 of the Sherman Act.  The plaintiffs do not explicitly oppose the Defendants' motion to dismiss this § 1 claim.

The SAC fails to plead sufficient facts to support a plausible claim that the two Retailer Defendants conspired with each other.  Barnes & Noble and Follett compete with each other and with other retailers for the opportunity to become an Institution's on-campus bookstore.  The SAC alleges that Inclusive Access "is a win" for the Retailer Defendants, who

"directly benefit" from it.  As the SAC itself concedes, therefore, agreeing to be an Institution's exclusive partner in providing that Institution's students with all of their textbooks, including digital textbooks sold through Inclusive Access, was very much in each Retailer Defendant's independent financial interest.

### 3.  Hub-and-Spoke Conspiracy

The third form of conspiracy that the SAC may attempt to plead is a so-called "hub-and-spoke" conspiracy among the Defendants, with each Publisher Defendant at the hub of a conspiracy with the two Retailer Defendants and the many Institutions that have adopted Inclusive Access.  The plaintiffs do not explicitly oppose the Defendants' motion to dismiss this alternative § 1 claim.

"[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'"  Apple, 791 F.3d at 314 (citation omitted).  The SAC fails to plead that the Retailer Defendants and the Institutions, the "spokes" in the alleged hub-and-spoke conspiracy, entered into a horizontal agreement with each other.  This alone is fatal to the plaintiffs' claim.  The SAC pleads a series of vertical

agreements between each Publisher Defendant and Institution and between each Retailer Defendant and Institution.  It does not, however, plead that any of the Publisher Defendants used these vertical agreements to coordinate a horizontal agreement among the Retailer Defendants and/or the Institutions.  The plaintiffs' claim for a hub-and-spoke conspiracy fails.  The SAC's claims under § 1 are dismissed.

C.   Section 2

The plaintiffs bring claims under § 2 of the Sherman Act, counts 1 through 6, as well.  Counts 3 and 6 assert that the Publisher Defendants monopolized those markets.  Counts 1, 2, 4, and 5 allege that the Defendants conspired to monopolize certain textbook markets.  The Defendants move to dismiss the plaintiffs' monopolization claims on the ground that, among other deficiencies, the SAC does not plausibly plead a relevant market.  They move to dismiss the SAC's conspiracy-to-monopolize claims on the ground that it fails to plead an agreement.  For the reasons discussed below, the Defendants' motion is granted with respect to each of the plaintiffs' § 2 claims.

1.   Market Definition

For purposes of the Sherman Act, "the relevant market is the area of effective competition within which the defendant operates."  Concord, 817 F.3d at 52 (citation omitted).  "[A]

32

market consists of an area where sellers, if unified by a hypothetical cartel or merger, <u>could profitably raise prices</u> significantly above the competitive level." <u>Id.</u> (citation omitted). "[T]he concept of a market has two components: a product market and a geographic market." <u>Id.</u>

"A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced -- price, use and qualities considered." <u>Id.</u> (citation omitted). The "outer boundaries" of the relevant product market are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." <u>Sabre</u>, 938 F.3d at 64 (citation omitted); <u>see</u> <u>Eastman Kodak Co. v. Image Tech. Servs., Inc.</u>, 504 U.S. 451, 481-82 (1992). Thus, products will be considered to be reasonably interchangeable "if consumers treat them as acceptable substitutes." <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002) (citation omitted). "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 201-02 (2d Cir. 2001) (citation omitted). In defining the relevant market, courts are to consider the "'commercial

realities' faced by consumers." Kodak, 504 U.S. at 482 (quoting United States v. Grinnell Corp., 384 U.S. 563, 572 (1966)).

The inquiry into the relevant geographic market, on the other hand, "seeks to identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market." Concord, 817 F.3d at 52-53 (citation omitted). "Courts generally measure a market's geographic scope, the area of effective competition, by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." Id. at 53 (citation omitted). "Taken together, the product and geographic components illuminate the relevant market analysis, which is essential for assessing the potential harm to competition from the defendants' alleged misconduct." Id. (citation omitted).

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes -- analysis of the interchangeability of use or the cross-elasticity of demand, and it must be 'plausible.'" Todd, 275 F.3d at 200 (citation omitted). "Although market definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage, there is no absolute rule

against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way."  <u>Concord</u>, 817 F.3d at 53 (citation omitted).  "Thus, in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market."  <u>Id.</u>

The SAC alleges that the relevant product markets in this action are "the markets for each textbook assigned in courses subject to Inclusive Access" ("Textbook Markets").  Although the SAC claims that "used, electronic, and earlier versions of textbooks, which are available on the secondary market, are no longer interchangeable with Inclusive Access textbooks," in opposing the Defendants' motion to dismiss, the plaintiffs clarify that the Textbook Markets "include the textbooks assigned for a particular course <u>in whatever format and from whatever source</u>."  (Emphasis in original.)  The SAC alleges that the relevant geographic market is the United States.  It also claims that "a Publisher Defendant has a market share of over 95% in each Textbook Market."

Even if it is assumed that the Textbook Markets are not limited to any single format or source, defining a Textbook

Market as a single textbook is too narrow.  The relevant market must include every product that consumers treat as an acceptable substitute.  Here, it is the Institutions (and their faculty) that decide which textbooks to assign for their courses and therefore which textbooks the Institution and/or its on-campus bookstore will purchase.  In making this decision, an Institution is presented with a menu of options.  For example, when choosing a textbook for an introductory economics course, an Institution and its faculty can elect to assign any author's introductory economics textbook.  Accordingly, "each textbook" cannot serve as the relevant market because it excludes interchangeable products -- namely, rival authors' and publishers' textbooks for each course.

The plaintiffs defend their relevant market definition by switching the focus from the Institution's choice and purchase of a book, including Inclusive Access digital textbooks, to the students.  The plaintiffs argue that it is the students, not the Institutions and their faculty, who are the "consumers" for purposes of the relevant market inquiry.  Highlighting the disconnect "between the party selecting the product and the party buying it," the plaintiffs emphasize that the students pay for the Inclusive Access textbooks.  But, as the SAC explains, the Institution first purchases Inclusive Access textbooks from

the Publisher Defendants at negotiated prices.  The Institutions
then authorize their on-campus bookstores to resell the
textbooks to the students at a markup.  Thus, both the
Institutions and their students are consumers and pay for
Inclusive Access, albeit at different stages of the process.

The fundamental "commercial realit[y]" dictates that the
Institutions and their faculty are the relevant consumers for
the antitrust claims pursued here.  Kodak, 504 U.S. at 482
(citation omitted).  Given this reality, the plaintiffs'
Textbook Markets are too narrowly defined.  Accordingly, the SAC
fails to plead a plausible relevant market, and its § 2
monopolization claims are dismissed.

2.   Conspiracy to Monopolize

The SAC also alleges that the Defendants conspired to
monopolize the Relevant Markets.  The Defendants move to dismiss
this claim on the ground that the SAC also fails to plead
evidence of an agreement.

Section 2 of the Sherman Act prohibits entities from
"combin[ing] or conspir[ing] with any other person or persons,
to monopolize any part of the trade or commerce among the
several States . . . ."  15 U.S.C. § 2.  The elements of a § 2
conspiracy to monopolize claim are: "(1) proof of a concerted
action deliberately entered into with the specific intent to

achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 233 (2d Cir. 1999). "[I]n deciding whether there is concerted action, courts routinely apply the same analysis under both Sections 1 and 2." 2 Julian von Kalinowski, Peter Sullivan, & Maureen McGuirl, Antitrust Laws and Trade Regulation § 26.02 (2d ed. 2021).

The plaintiffs' conspiracy-to-monopolize claims fail for the same reason that their claims brought under § 1 do -- namely, the SAC fails to plausibly plead an agreement. More fundamentally, accepting the plaintiffs' market definition, it would be unnecessary for any of the Publisher Defendants to conspire to monopolize a Textbook Market. The copyright laws give each publisher a monopoly in its textbook. For both of these reasons, the plaintiffs' § 2 conspiracy-to-monopolize claims are dismissed.

II.  State Law Claims

The SAC also asserts that the Defendants are liable under the antitrust statutes of 26 states and the District of Columbia. The parties agree that the state antitrust statutes should be construed in harmony with federal antitrust law where possible. Because the plaintiffs' federal antitrust claims

under the Sherman Act fail, their claims under the state

antitrust statutes must be dismissed as well.

### Conclusion

The Defendants' January 22, 2021 motion to dismiss is

granted.  The Clerk of Court shall close the case and enter

judgment for the Defendants.

Dated:     New York, New York
           June 14, 2021


_____
DENISE COTE
United States District Judge